**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| TERRY MARESH,<br><br>          Plaintiff,<br>   vs.<br><br>CHICAGO BRIDGE & IRON COMPANY N.V., MARSHA C. WILLIAMS, L. RICHARD FLURY, WESTLEY STOCKTON, LARRY MCVAY, W. CRAIG KISSEL, DEBORAH M. FRETZ, JAMES R. BOLCH, JAMES H. MILLER, TRAVIS L. STRICKER, FORBES I.J. ALEXANDER, and JOHN R. ALBANESE,<br><br>       Defendants. | Civil Case No.: 4:18-cv-00498<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Terry Maresh ("Plaintiff"), brings this suit for violations of Sections 14(a) and 20(a) of the Securities Exchange Act Of 1934. In support of this Complaint, Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

**NATURE OF THE ACTION**

1.      Plaintiff brings this action against Chicago Bridge & Iron Company N.V., ("CB&I" or the "Company") and the Company's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of CB&I. Specifically,

1

Defendants solicit stockholder approval in connection with the sale of the Company and its affiliates Comet I B.V., Comet II B.V., CB&I Oil & Gas Europe B.V., CB&I Group UK Holdings, CB&I Nederland B.V., and The Shaw Group, Inc. (collectively with CB&I, "CB&I") through a Registration Statement that omits material facts necessary to make the statements therein not false or misleading. Stockholders need this material information to decide whether to vote in favor of the merger.

2.      On December 18, 2017, the Company announced that it had entered into a definitive agreement (the "Business Combination Agreement") with McDermott International, Inc. ("McDermott") and its affiliates—McDermott Technology, B.V. ("McDermott Bidco"), McDermott Technology (Americas), LLC, and McDermott Technology (US), LLC. (collectively with McDermott, "McDermott") pursuant to which McDermott and CB&I will combine their businesses by a series of transactions, beginning with McDermott Bidco launching an offer to exchange any and all of CB&I's common stock for 2.47221 shares of McDermott common stock, or, if McDermott effects a planned 3-to-1 reverse stock split (the "Reverse Stock Split") prior to the closing of the Proposed Transaction, 0.82407 shares of McDermott common stock. Upon closing of the Proposed Transaction, McDermott stockholders will own approximately 53% of the outstanding shares of McDermott common stock and CB&I shareholders will own approximately 47% of the outstanding shares of McDermott common stock.

3.      In connection with the Proposed Transaction, on January 24, 2018, the Company filed a materially incomplete and misleading Form S-4 Registration Statement (the "Registration Statement") with the Securities and Exchange Commission ("SEC"). The Registration Statement is materially deficient and misleading because, inter alia, it fails to disclose material information relating to: (i) the background of the transaction; (ii) potential conflicts of interest involving

Centerview Partners LLC ("Centerview"),  the Company's financial advisor; (iii) CB&I's financial forecasts, which were distributed by CB&I's management to its shareholders in connection with the proposed merger; and (iv) the valuation analyses prepared by Centerview in connection with the rendering of its fairness opinion. Without all material information CB&I stockholders cannot make an informed decision regarding whether to vote for or against the Proposed Transaction. Accordingly, the failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as stockholders need such information in order to make a fully-informed decision in connection with the shareholder vote on the Proposed Transaction.

4.      For these reasons and as set forth in detail herein, the Individual Defendants have violated federal securities laws.  Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of these laws. Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Section 20(a) and 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.

6.      The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

3

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists. CB&I is incorporated in the Netherlands and maintains its administrative headquarters in this District. Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

8.      Plaintiff is, and has been at all relevant times, the owner of shares of CB&I common stock.

9.      Marsha C. Williams ("Williams") has served as a member of the Supervisory Board since 1997. She is the Chairman of the Nominating Committee and also serves as a member of the Audit Committee and the Corporate Governance Committee.

10.     L. Richard Flury ("Flury") has served as Non-Executive Chairman since 2010 and has been a member of the Supervisory Board since 2003. Additionally, Flury is Chairman of the Strategic Initiatives Committee and he is a member of the Corporate Governance Committee and the Nominating Committee.

11.     Westley Stockton ("Stockton") has served as a member of the Supervisory Board since 2016. Stockton currently serves as the Company's Vice President, Corporate Controller, and Chief Accounting Officer.

12.     Larry McVay ("McVay") has been a member of the Supervisory Board since 2008. Currently, McVay serves as the Chairman of the Corporate Governance Committee in addition to his role as a member of both the Audit Committee and Strategic Initiatives Committee.

13.     W. Craig Kissel ("Kissel") has served as a member of the Supervisory Board since

4

2009. Kissel chairs the Organization and Compensation Committee, and currently serves as a member of both the Corporate Governance Committee, and Nominating Committee.

14.     Deborah M. Fretz ("Fretz") has been a member of the Supervisory Board since 2013 and currently serves as a member of the Audit Committee, the Organization and Compensation Committee, and the Corporate Governance Committee.

15.     James R. Bolch ("Bolch") has served as a member of the Supervisory Board since 2012. Bosch currently serves as a member of the Corporate Governance Committee, the Organization and Compensation Committee, and the Nominating Committee.

16.     James H. Miller ("Miller") has been a member of the Supervisory Board since 2014, and currently serves as a member of the Audit Committee, the Corporate Governance Committee, and the Strategic Initiatives Committee. Prior to his election, Miller served as a consultant to the Supervisory Board beginning in April 2013.

17.     Travis L. Stricker ("Stricker") has served as CB&I's Vice President, Financial Operations for Engineering & Construction since 2013. Previously, Stricker had served as Vice President, Financial Operations since August 2008. Stricker was elected to the Supervisory Board in 2016.

18.     Forbes I.J. Alexander ("Alexander") was elected to the Supervisory Board after previously serving as an advisor to the Board since September 2016. Alexander was recommended for election to the Supervisory Board in light of his extensive professional and financial knowledge and experience, ability to serve for five years, his independence and compatibility, with existing Supervisory Board members, management and the Company's corporate culture.

19.     John R. Albanese ("Albanese") has served as CB&I's Vice President Finance, Technology since December 2014, and as Vice President Finance, Technology and Government

Solutions from February 2013 to December 2014. Albanese was elected to CB&I's Supervisory Board in 2017.

20.     Defendants Albanese, Alexander, Stricker, Miller, Bolch, Fretz, Kissel, McVay, Stockton, Flury, and Williams are collectively referred to herein as the "Supervisory Board" or the "Individual Defendants."

21.     Defendant CB&I is a global leader in the development, design, manufacture, marketing and distribution of copper, aluminum and fiber optic wire and cable products for use in the energy, industrial, construction, specialty and communications markets. The company is incorporated in the Netherlands and maintains its administrative headquarters at One CB&I Plaza, 2103 Research Forest Drive, The Woodlands, Texas 77380. CB&I's common stock is traded on the New York Stock Exchange under the symbol "CBI." CB&I and the Individual Defendants are collectively referred to herein as "Defendants."

## OTHER RELEVANT ENTITIES

22.     McDermott International, Inc., a corporation incorporated under the laws of the Republic of Panama in 1959, is a leading provider of integrated engineering, procurement, construction and installation, front-end engineering and design and module fabrication services for upstream field developments worldwide. The company's stock is listed is listed on the New York Stock Exchange ("NYSE") under the trading symbol "MDR." McDermott's maintains its principal executive offices are located at 4424 West Sam Houston Parkway North, Houston, Texas 77041.

23.     McDermott Technology, B.V. is a company incorporated under the laws of the Netherlands, is a direct wholly owned subsidiary of McDermott, and was incorporated for the purpose of consummating the Proposed Transaction.

24.     McDermott Bidco is a company incorporated under the laws of the Netherlands, a

wholly owned subsidiary of McDermott, and a party to the Business Combination Agreement.

## FACTUAL BACKGROUND

### The Merger Process

25.     CB&I's outstanding long-term indebtedness has resulted in the company making a number of recent strategic decisions over the past two years in an effort to help the company's financial prospects. This process led to CB&I's divestiture of certain non-core businesses, including the 2016 sale of its nuclear construction business and the 2017 sale of its capital services business.

26.     These efforts were only marginally successful, and in of February and May 2017, CB&I entered into amendments to the terms of certain of CB&I's outstanding indebtedness due to CB&I's inability to comply with certain financial covenants and other requirements under such indebtedness. Absent these amendments, CB&I would have been in default with respect to its outstanding financial indebtedness, causing it to accelerate and become immediately due and payable. In connection with the May 2017 amendments, CB&I granted liens on substantially all of its assets, including the assets of CB&I's technology and engineered products businesses, to the holders of CB&I's outstanding indebtedness, with the result that such indebtedness became secured on a first lien basis.

27.     These financial difficulties continued into the following month when, in early June, CB&I determined that there was risk that the Company might again be unable to comply with certain covenants contained in CB&I's outstanding indebtedness. To address these concerns, CB&I senior management began to consider the possibility of a partial or whole spin-off or sale of CB&I's technology and engineered products business (the "Technology Sale") in the hope that the spin-off or sale would generate enough money to pay off CB&I's outstanding indebtedness.

28.     On July 25, 2017, Michael Taff, CB&I's chief financial officer met with Stuart Spence, McDermott's chief financial officer, allegedly at Mr. Spence's request. During this meeting, Mr. Spence first raised the possibility of a business combination between McDermott and CB&I.

29.     Follow-up meetings between members of senior management of CB&I and members of senior management of McDermott occurred intermittently throughout the month of August, and on August 15, 2017, CB&I and McDermott entered into a mutual nondisclosure confidentiality agreement to facilitate confidential negotiations and due diligence. Also in August 2017, CB&I engaged Centerview to act as a financial advisor with respect to the possible business combination and related financing matters.

30.     While CB&I and McDermott, and their respective representatives discussed the merits of a potential business combination and worked on a plan to complete mutual due diligence, CB&I continued to move forward with the Technology Sale. Assisting in this process was an undisclosed internationally recognized financial institution (the "Technology Sale Advisor") that CB&I had retained in late July. In September 2017, the Technology Sale Advisor began outreach to potential purchasers of the technology business, ultimately entering into confidentiality agreements with more than 30 potentially interested parties.

31.     On September 27, 2017, the deadline for the submission of initial indications of interest in the Technology Sale process, CB&I received proposals from eight potential buyers of the technology business. The total consideration in such indications of interest ranged from approximately $1.2 billion to approximately $3 billion. Of the eight potential buyers, CB&I invited five parties to continue in the Technology Sale process.

32.     Two days later, on September 29, 2017, McDermott's chief executive officer,

David Dickson submitted to CB&I a letter setting out a preliminary, nonbinding proposal for a business combination between CB&I and McDermott, in an all-stock transaction in which former CB&I shareholders would receive McDermott shares representing approximately 46% of McDermott's total outstanding shares on a pro forma basis. Included in the letter was an indication that the board of directors of the combined company would include current members of each of the McDermott Board and the CB&I Supervisory Board, and that the management of the combined business would be drawn from both CB&I and McDermott.

33.     Negotiations between CB&I and McDermott, and their respective representatives, continued into the months of October and November, and on November 7, 2017, the CB&I Supervisory Board held a telephonic meeting to discuss the negotiations with McDermott, the status of the Technology Sale, and to review CB&I's other strategic alternatives, including filing for bankruptcy protection and options for refinancing CB&I's existing indebtedness.

34.     On November 20, 2017, which was the requested deadline for submission of final proposals in the Technology Sale, CB&I received three proposals with total consideration ranging from approximately $2.25 billion to approximately $2.5 billion. The following day, during a telephonic meeting of the CB&I Supervisory Board, the Board determined that CB&I would continue negotiations with the two highest bidders to seek to reach an agreement on a potential actionable transaction. However, during the first week of December, due to the need for additional time in order to obtain adequate financing commitments for the combined company in connection with a business combination with McDermott and/or to arrange adequate financing for CB&I on a standalone basis in the event of a Technology Sale, CB&I requested an extension from the creditor group of the deadline to enter into an agreement for a Technology Sale. An extension was granted to extend the deadline to December 18, 2017.

35.     On December 6, 2017, the CB&I Supervisory Board held a regularly scheduled board meeting, during which time CB&I's Board determined that a business combination with McDermott presented the best alternative available to CB&I and all of its stakeholders, and that continuing to actively pursue other strategic alternatives, including a potential Technology Sale, was likely to jeopardize CB&I's ability to achieve any of the available alternatives. Consequently, the Board determined that it was in the best interests of all of CB&I's stakeholders for CB&I to focus its resources on pursuing a business combination with McDermott and working with McDermott to obtain sufficient financing commitments for the combined business.

36.     From December 6 through December 16, 2017, CB&I and McDermott, and their respective representatives, negotiated the Business Combination Agreement and related documentation, and Messrs. Spence and Taff spoke by telephone on several occasions to discuss, negotiate or resolve certain aspects of the proposed business combination, including structure, financing, social issues and select terms of the Business Combination Agreement and related documentation.

37.     On December 15, 2017, McDermott and CB&I agreed on a final exchange ratio, calculated to result in the previously agreed ownership percentages in the combined company.

38.     Two days later, on December 17, 2017, the CB&I Supervisory Board held a telephonic meeting to consider the transaction with McDermott. At this meeting Representatives of Centerview reviewed certain financial analyses that it had performed, and delivered its oral opinion, which was simultaneously delivered in writing, to the Board that, as of the date of such opinion and subject to the assumptions, limitations, qualifications and other matters considered in the preparation thereof as set forth in its written opinion, the consideration to be paid to the holders of the common stock of the Company in the proposed merger is fair, from a financial point of

view, to such holders. Following further discussions, the Board unanimously: unanimously determined that the Business Combination Agreement and the combination were fair to, advisable and in the best interests of CB&I and its stockholders and unanimously approved the Business Combination Agreement and the Combination, with such determination and approval conditioned on confirmation by CB&I management that McDermott had obtained financing commitments in an amount deemed to be sufficient by CB&I management.

39.     On December 17, 2017 and December 18, 2017, CB&I, McDermott and their advisors finalized the final details of the Business Combination Agreement and McDermott completed the obtaining of financing commitments for the new financing to be used to repay or refinance existing indebtedness of each of CB&I and McDermott and to finance the combined company's operations following completion of the Combination. In the afternoon of December 18, 2017, CB&I and McDermott executed the Business Combination Agreement, McDermott entered into financing commitments with respect to the combination and CB&I executed the amendments to the terms of its existing indebtedness, and CB&I and McDermott issued a joint press release announcing the Combination.

**The Merger Announcement**

40.     In a joint press release dated December 18, 2017, CB&I and McDermott announced that the two entities had entered into the Business Combination Agreement.

41.     The press release states in pertinent part:

**HOUSTON and THE WOODLANDS, Texas – December 18, 2017** – McDermott International, Inc. (NYSE:MDR) and CB&I (NYSE:CBI) today announced that the companies have agreed to combine in an all-stock transaction to create a premier fully vertically integrated onshore-offshore company, with a broad engineering, procurement, construction and installation ("EPCI") service offering and market leading technology portfolio.

11

Upon completion of the transaction, McDermott shareholders will own approximately 53 percent of the combined company on a fully diluted basis and CB&I shareholders will own approximately 47 percent. Under the terms of the business combination agreement ("BCA"), CB&I shareholders will be entitled to receive 2.47221 shares of McDermott common stock for each share of CB&I common stock owned (or 0.82407 shares if McDermott effects a planned three-to-one reverse stock split prior to closing), subject to any withholding taxes. The estimated enterprise value of the transaction is approximately $6 billion, based on the closing share price of McDermott on December 15, 2017.

"Customers worldwide increasingly seek a single company that can offer end-to-end solutions, and the combination of McDermott and CB&I responds to these evolving customer needs by creating a leading vertically integrated company," said David Dickson, President and Chief Executive Officer of McDermott. "This transaction combines two highly complementary businesses to create a leading onshore-offshore EPCI company driven by technology and innovation, with the scale and diversification to better capitalize on global growth opportunities. McDermott has been on a three-year journey that has transformed our company and created a model for delivering sustainable and profitable growth that we believe will unlock value in the near and long term. By applying McDermott's operational excellence across the combined portfolio, we will be a best-in-class solutions provider driven by consistency in systems, processes, execution and culture. We have great respect for the CB&I team and look forward to working with them to realize significant benefits for our combined shareholders, customers and employees."

"The combination with McDermott maximizes value for shareholders and provides the opportunity to participate in significant upside potential as we create a premier vertically integrated engineering, procurement, fabrication, construction and installation provider with significant scale, diversification and global presence," said Patrick K. Mullen, CB&I President and Chief Executive Officer. "Together, we will have a broadened reach across the entire energy industry that addresses evolving customer needs, along with a much stronger and more flexible financial profile than CB&I would independently, which will benefit all our stakeholders. This unique opportunity to combine with McDermott was presented as we pursued the sale of our Technology and former Engineered Products businesses. Our Supervisory and Management Boards and our management team reviewed multiple strategic options and we ultimately decided this transaction is the best path forward and in the best interest of CB&I, and its shareholders and other stakeholders."

**Highly Compelling Strategic and Financial Rationale**

- **Complementary global portfolio and an established presence in high-growth markets**. This combination will unite McDermott's established presence in the Middle East and Asia with CB&I's robust operations in the United States, creating a balanced geographic portfolio with a strong position

in high growth developing regions. Further, the combination will create significant opportunities to capture additional value from market trends across the entire value chain. Together, McDermott and CB&I will have a presence across onshore and offshore, upstream, downstream and power markets, enhancing competitiveness and enabling more consistent, predictable performance through market cycles.

- **Greater ability to respond to evolving customer needs**. The combined company will offer customers engineered and constructed facility solutions and fabrication services across the full lifecycle, executed to maximize asset value. Customers will also benefit from enhanced exposure across diverse end markets, including refining, petrochemicals, LNG and power.

- **Enhanced financial profile to support growth**. The combined company is expected to have a strong capital structure. On a pro forma combined basis, McDermott and CB&I would have combined revenues of approximately $10 billion and a backlog of approximately $14.5 billion. The combined company is expected to generate EBITDA growth and strong free cash flow, enabling it to rapidly de-lever.

- **Leverages CB&I's strong technology capabilities**. By retaining CB&I's Technology business, with its 3,000 patents and patent application trademarks and more than 100 licensed technologies, the combined company will be one of the world's largest providers of licensed process technologies. McDermott and CB&I anticipate leveraging these capabilities across their customer base to drive follow-on work.

- **Cash accretive with opportunities for cost and revenue synergies**. The transaction is expected to be cash accretive, excluding one-time costs, within the first year after closing. It is also expected to generate annualized cost synergies of $250 million in 2019. This is in addition to the $100 million cost reduction program that CB&I expects to have fully implemented by the end of 2017 previously implemented. The cost synergies are expected to come from operations optimization, G&A savings, supply chain optimization and other related cost savings. Further, McDermott and CB&I expect that the transaction will lead to substantial revenue synergies due to the enhanced capabilities of the combined company.

- **Common attributes focused on safety and customer engagement**. McDermott and CB&I's combined experience in delivering customer centric solutions and fixed price lump-sum contracts will form the basis for the combined company to deliver a consistent approach to executing projects for customers. Further, their similar cultures will ensure safety remains the number one priority and will help facilitate a seamless transition for partners and employees worldwide.

**Headquarters and Governance**

Following completion of the transaction, the combined company will be headquartered in the Houston area. David Dickson, current President and Chief Executive Officer of McDermott, will be President and Chief Executive Officer of the combined company, and Stuart Spence, current Executive Vice President and Chief Financial Officer of McDermott, will be Executive Vice President and Chief Financial Officer of the combined company. Patrick Mullen, President and Chief Executive Officer of CB&I, will remain with the combined company for a transition period to ensure a seamless integration. Operational leadership will include representatives from both companies.

The Board of Directors will be comprised of 11 members, including 10 independent directors and David Dickson. Five of the independent directors will come from McDermott and five will come from CB&I. Gary P. Luquette, Non-Executive Chair of the McDermott Board, will serve as the combined company's Non-Executive Chairman.

**Transaction Structure**

The combination involves a series of transactions under Dutch law resulting in the sale of CB&I's entire business, as well as an exchange offer by McDermott in which CB&I's shareholders can tender their shares. Both the sale and the exchange offer will result in the same consideration for CB&I's shareholders (subject to tax consequences, including potential Dutch withholding taxes in respect of shareholders that do not participate in the exchange offer).

**Financing, Completion and Approvals**

The combined company has secured approximately $6 billion of fully-committed financing, led by Barclays, Credit Agricole CIB and Goldman Sachs & Co. LLC., and it is expected that permanently funded debt financing in the form of term loans and unsecured bonds will be put into place prior to closing.

The transaction has been approved by the Boards of both companies and is expected to be completed in the second quarter of 2018. It remains subject to regulatory antitrust approvals, approval by McDermott's and CB&I's shareholders and other customary closing conditions.

**CB&I Technology Business**

The transaction includes CB&I's Technology business and former Engineered Products business, for which CB&I has obtained from its lender group various amendments to its debt covenants.

**The Registration Statement Omits Material Information**

42.     On January 24, 2017, CB&I caused to be filed a Form S-4 Registration Statement

14

with the SEC. As alleged below and elsewhere herein, the Registration Statement contains material misrepresentations and omissions of fact that must be cured to allow CB&I stockholders to render an informed decision with respect to the Proposed Transaction.

43.     As discussed below, the Registration Statements omits material information regarding: (i) the background of the transaction; (ii) potential conflicts of interest involving the Company's financial advisor; (iii) CB&I's financial forecasts, which were distributed by CB&I's management to its shareholders in connection with the proposed merger; and (iv) the valuation analyses prepared by CB&I's financial advisor in connection with the rendering of its fairness opinion.

44.     This material information directly impacts the Company's expected future value as a standalone entity, and its omission renders the statements made materially misleading and, if disclosed, would significantly alter the total mix of information available to CB&I stockholders. Accordingly, CB&I stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

### Material Omissions Concerning the Sale Process:

45.     With regard to the omission of material information relating to the sale process leading up to the Proposed Transaction, the Registration Statement indicates that the Company entered into confidentiality agreements with over 30 potentially interested parties, including both strategic and financial buyers. However, details regarding the terms of the confidentiality agreements, including whether they contain standstill and/or "don't ask, don't waive" provisions that prohibit the counterparties from making an unsolicited superior proposal to CB&I are worryingly absent from the Registration Statement.

46.     The absence of this information is notable. The Business Combination Agreement

provides that CB&I and its affiliates shall "not grant any waiver or release under or knowingly fail to enforce any confidentiality, standstill or similar agreement entered into or amended during the 12 months immediately preceding the date of this Agreement in respect of a proposed Comet Acquisition Proposal." Accordingly, without further information, the Company's stockholders are being misled into assuming that other interested parties, which were actively interested in acquiring the Company, could make an offer to acquire the Company if they so choose – when it is likely that they are actually precluded from doing so.

47.     This problem is compounded by the further absence of information relating to the actual economic and other terms proposed by each of the companies that submitted proposals to engage in a transaction with CB&I. On September 27, 2017, the deadline for the submission of initial indications of interest in the Technology Sale process, CB&I received proposals from eight potential buyers of the technology business. The total consideration in such indications of interest ranged from approximately $1.2 billion to approximately $3 billion. Additionally, on November 20, 2017, CB&I received three final proposals for a transaction with the Company, with total consideration ranging from approximately $2.25 billion to approximately $2.5 billion. However, despite disclosing the receipt of these indications of interest, the Registration Statement conspicuously omits any further information regarding the nature of these proposals or the precise valuations of these respective indications of interest.

48.     Accordingly, without further information regarding the nature of these offers and the approximate valuation of these offers, the Company's stockholders are unable to evaluate whether these companies were willing to make a competitive offer to acquire the Company nor are they capable of evaluating any revised proposals from these companies. Furthermore, without further information regarding the Confidentiality Agreements these entities entered into with

CB&I, the Company's stockholders are being misled into assuming that other interested parties, which were actively interested in acquiring the Company, could make an offer to acquire the Company if they so choose – when it is likely that they are actually precluded from doing so.

49.     The omission of this information renders certain portions of the Registration Statement false and/or materially misleading in contravention of the Exchange Act including, inter alia, the following section of the Registration Statement: (i) "Background of the Combination;" and (ii) "CB&I's Reasons for the Combination; Recommendation of the CB&I Boards."

**_Material Omissions Concerning Centerview's Conflicts of Interest_**

50.     With regard to the potential conflicts of interest faced by Centerview, the Registration Statement fails to disclose material information concerning Centerview's prior relationship with CB&I.

51.     As disclosed on Page 105 of the Registration Statement, "[i]n the two years prior to the date of its written opinion, Centerview was engaged to provide certain financial advisory services to CB&I, including strategic advisory services, and Centerview received compensation from CB&I for such services." However, the Registration Statement omits to disclose the terms of Centerview's past strategic advisory services to CB&I, including the amount of compensation that Centerview has earned in connection with those services.

52.     As a result of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, full disclosure of investment banker compensation and all potential conflicts is necessary for stockholders to have a materially complete sense of the conflicts of interests operating in the background.  Despite this requirement, the Registration Statement contains misleading statements regarding Centerview's prior relationship with CB&I that make it extremely difficult for CB&I stockholders to properly evaluate

the Proposed Transaction.

53.     The omission of this information renders certain portions of the Registration Statement materially misleading, including, inter alia, the following sections of the Registration Statement: (i) "Background of the Combination;" (ii) "CB&I's Reasons for the Combination; Recommendation of the CB&I Boards;" and (iii) "Opinion of CB&I's Financial Advisor."

*Material Omissions Concerning CB&I's Financial Projections:*

54.     With respect to CB&I's and McDermott's projected financial information, the Registration Statement omits material information pertaining to the financial projections, and the valuation analyses performed by the Board's financial advisor in connection with the Proposed Transaction.

55.     As disclosed in the Registration Statement, CB&I's Unlevered Free Cash Flow were utilized in Centerview's discounted cash flow analysis, but were adjusted to exclude the cash impact of CB&I's net operating loss carryforwards, or NOLs. However, the Registration Statement omits to disclose these adjusted valuations, and instead simply provides only the unadjusted, higher set of unlevered free cash flows that were not actually used in Centerview's analysis.

56.     Similarly, with respect to McDermott's unlevered free cash flows, the Registration Statement only discloses McDermott's "free cash flows," but it omits to disclose McDermott's "unlevered free cash flows" that were actually used in Centerview's analysis.

57.     Additionally, as disclosed in the Registration Statement, Centerview conducted a Discounted Cash Flow Analysis that took into account the cost and operating synergies (the "Cost Synergies") that are expected to result from the Proposed Transaction during the years 2018 through 2022, and the tax-related synergies forecasted to result from tax basis step-up associated with the sale of CB&I's technology business for the 15-year period following the Proposed

Transaction (the "Tax Synergies"). However, the Registration Statement omits to disclose the projected Cost Synergies and Tax Synergies that are expected to result from the Proposed Transaction and that Centerview used in its analysis.

58.     Furthermore, the Registration Statement provides projected values for Adjusted EBITDA and Unlevered Free Cash Flow, all non-GAAP accounting metrics, for projected financial information over the years 2017-2022. However, the Registration Statement omits to disclose the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures. Providing projected values for Adjusted EBITDA and Unlevered Free Cash Flow without fully disclosing the line item metrics used to calculate them, or otherwise reconciling the non-GAAP projection to GAAP measures, makes the provided disclosures materially incomplete and misleading. Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance. Rather than disclose the information necessary to reconcile these measures, Defendants chose to omit this information.

59.     The omission of this material information renders the Registration Statement false and misleading, including, inter alia, the following sections of the Registration Statement: (i) "CB&I's Reasons for the Combination; Recommendation of the CB&I Boards;" (ii) "Opinion of CB&I's Financial Advisor;" and (iii) "Certain Forward-Looking Financial Information Prepared by CB&I."

### *Material Omissions Concerning Centerview's Financial Analyses*

60.     The Registration Statement describes Centerview's fairness opinion and the various valuation analyses it performed in support of its opinions. However, the description of Centerview's fairness opinion and the underlying analyses omits key inputs and assumptions of

CB&I underlying these analyses. Without this information, as described below, CB&I public stockholders are being misled as to what weight, if any, to place on Centerview's fairness opinions in determining whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to CB&I stockholders.

61.     Specifically, the Registration Statement discloses that Centerview conducted a *Selected Public Comparable Companies Analysis* for both CB&I and McDermott. While the Registration Statement discloses the mean, median, and range results of the analysis, the Registration Statement omits to disclose the individual multiples for each of the selected companies analyzed by Centerview, as well as any benchmarking analyses Centerview performed for CB&I in relation to the target companies.

62.     Similarly, with regard to the *Selected Precedent Transactions Analysis*, Centerview reviewed publicly available financial terms of the following selected transactions in the engineering, procurement and construction industry that Centerview in its professional judgment deemed relevant to consider in relation to CB&I, McDermott and the Combination. While the Registration Statement provides the resulting mean, median, and range valuations in this analysis, the Registration Statement omits to disclose the individual multiples or each of the transactions analyzed by Centerview, as well as any benchmarking analyses Centerview performed for CB&I in relation to the target companies.

63.     Finally, as noted above, there are a number of discrepancies between the values provided in the financial projections, and what was utilized in Centerview's *Discounted Cash Flow Analysis*. Accordingly, with respect to Centerview's *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose the following key components used in the analysis: (i) McDermott's standalone unlevered, after-tax free cash flows during the year ending December 31,

2018, through the year ending December 31, 2022; (ii) CB&I's net operating loss carry forwards ("NOL's"); (iii) the inputs and assumptions underlying the calculation of CB&I's enterprise value exit multiples ranging from 6.0 to 8.5x; (iv) the inputs and assumptions underlying the calculation of McDermott's enterprise value exit multiples ranging from 6.0 to 7.0x; (v) the inputs and assumptions underlying the calculation of CB&I's discount rates ranging from 9.5% to 10.5%; (vi) the inputs and assumptions underlying the calculation of McDermott's discount rates ranging from 11.0% to 12.0%; (vii) the estimated present value of CB&I's estimated NOL's for the years ending December 31, 2018, through December 31, 2028; (viii) the inputs and assumptions underlying the calculation of CB&I's NOL's discount rate of 10.5%; (ix) the unlevered-free cash flow Synergies that are expected to generate during the year ending December 31, 2018, through the year ending December 31, 2022; (xii) the inputs and assumptions underlying the calculation of enterprise value exit multiples ranging from 6.0 to 8.5x that were applied the Cost Synergies; (xiii) the inputs and assumptions underlying the calculation of discount rates ranging from 9.5% to 10.5% that were applied to the Cost Synergies; and (xiv) the net present value of CB&I's standalone U.S net operating losses.

64.    When a bankers' endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses are crucial to a fair presentation of the material facts. Furthermore, the disclosure of projected financial information provides stockholders with the best basis to project the future financial performance of a company, and allows stockholders to understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. This information is therefore material, and must be disclosed if CB&I stockholders are to make a fully informed decision. The omission of this

information renders the statements made concerning the financial advisors' analyses and opinions materially misleading.

65.     Without such undisclosed information, CB&I stockholders cannot evaluate for themselves whether the financial analyses performed by Centerview were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can evaluate the extent to which Centerview's opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

66.     The omission of this information renders certain portions of the Registration Statement materially misleading, including, inter alia, the following sections of the Registration Statement: (i) "Background of the Combination;" (ii) "CB&I's Reasons for the Combination; Recommendation of the CB&I Boards;" (iii) "Opinion of CB&I's Financial Advisor;" and (iv) "Certain Forward-Looking Financial Information Prepared by CB&I."

67.     Based on the foregoing, the Registration Statement violates Section 14(a) of the Exchange Act and applicable SEC regulations by materially misleading CB&I stockholders. CB&I public shareholders lack critical information necessary to evaluate the Proposed Transaction. Moreover, without the key financial information and related disclosures, CB&I public shareholders cannot gauge the accuracy and reliability of the financial analyses performed by Centerview, and whether they can reasonably rely on the financial advisor's fairness opinions.

68.     Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

69.     Plaintiff repeats and realleges each allegation set forth herein.

70.     As detailed herein, Defendants disseminated the materially incomplete and misleading Registration Statement specified above, which contained statements and omissions which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary to make the statements therein not misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

71.     By the use of the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of their names to solicit proxies or consents or authorizations in respect of the common stock of CB&I.

72.     By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Registration Statement. The Registration Statement was prepared, reviewed, and/or disseminated by Defendants. The Registration Statement misrepresented and omitted material facts, including material information about the sale process for the Company, the consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing and disseminating the Registration Statement with these materially incomplete and misleading statements and omissions. Defendants have also failed to correct the Registration Statement and the failure to update and correct false statements is also a violation of

23

Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

73.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to stockholders.

74.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which defendants' actions threaten to inflict.

<u>**COUNT II**</u>

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

75.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

76.     The Individual Defendants acted as controlling persons of CB&I within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of CB&I and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false statements and omissions contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

77.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the

issuance of the statements or to cause the statements to be corrected.

78.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Registration Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

79.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and information that they reviewed and considered – descriptions which had input from the Individual Defendants.

80.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

a) declaring that the Registration Statement is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b) preliminarily and permanently, enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until

Defendants disclose the material information identified above which has been omitted from the Registration Statement;

c)  to the extent the Proposed Transaction is consummated prior to the Court's entry of a final judgment, awarding Plaintiff rescissory damages against the Individual Defendants, including, but not limited to, pre-judgment and post-judgment interest;

d)  awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

e)  granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  February 16, 2018


Respectfully submitted,

**DEANS & LYONS, L.L.P.**

_____
**Christopher J. Simmons**
State Bar No. 24058796
325 N. Saint Paul St., Suite 1500
Dallas, Texas 75201
Telephone: (214) 965-8500
Facsimile: (214) 965-8505
csimmons@deanslyons.com

**ATTORNEY FOR PLAINTIFF**

26

**CO-COUNSEL**

**LEVI & KORSINSKY, LLP**
Donald J. Enright (to be admitted *pro hac vice*)
Elizabeth K. Tripodi (to be admitted *pro hac vice*)
1101 30th Street, N.W., Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
Email: denright@zlk.com
       etripodi@zlk.com